IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 11-61-M-DLC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| JASON WASHINGTON, | ) | |
| DARIN MOWER, | ) | |
| GREGORY ZUCKERT, | ) | |
| STEVEN SANN, | ) | |
| LISA FLEMING, | ) | |
| JESSE SHEWALTER, and | ) | |
| CHRISTOPHER CRONSHAW, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I. Introduction

This Opinion and Order resolves the many outstanding pretrial motions filed

in this matter by Defendants Jason Washington, Lisa Fleming, and Steven Sann.

The three are charged, along with four other co-defendants, with offenses related to the manufacture and distribution of marijuana. Defendant Washington also faces a gun charge. The charges allege conduct that occurred at least in part in the context of a medical marijuana dispensary established during the effective period of the Montana Medical Marijuana Act ("MMMA"), which was passed by voter initiative in 2004 and superseded by a revised law, known as the Montana Marijuana Act ("MMA"), in 2011. As the Court has previously stated, it will assume, for purposes of deciding the pending motions to dismiss only, that the Defendants' conduct was in full compliance with the Montana Medical Marijuana Act and later the Montana Marijuana Act. Despite that assumption in the Defendants' favor, nearly all of their motions are denied. The Court takes this opportunity, prior to undertaking an analysis of the legal merits of each of the pending motions, to explain in general terms the reasons why it believes the law compels this outcome.

Marijuana is a prohibited Schedule I substance under the Controlled Substances Act, 21 U.S.C. § 801, *et seq*., a statutory classification that has been in place since 1970, and persisted throughout the time frame of the events alleged in the Indictment. Nonetheless, beginning in 2009 various officials in the executive branch of the United States government made public statements suggesting that it

is the policy of the federal government to refrain from prosecuting participants in a state-authorized medical marijuana program, provided those participants acted in compliance with state law. These statements by federal officials were nebulous, equivocal, and heavily qualified. However, it is clear that no federal official has ever stated that the cultivation, sale, or use of medical marijuana is *legal* under federal law. Still, when taken in the aggregate, particularly through the filter of the news media, the words of federal officials were enough to convince those who were considering entry into the medical marijuana business that they could engage in that enterprise without fear of federal criminal consequences. They began cultivating and selling medical marijuana under the assumption that they could become legitimate providers under state law and not be selectively arrested and prosecuted under federal law. Regardless of the wisdom of that choice, it is a choice many Montanans have made.

That choice has now proven very costly for those providers, including the Defendants in this case, whose medical marijuana businesses have been raided by federal agents, and who are now facing federal felony marijuana distribution charges, many of which carry mandatory minimum sentences of five years or more in federal prison, notwithstanding the fact that many of these same individuals have non-existent or minimal criminal histories. While a few have been

prosecuted by the federal government, thousands of Montanans continue to use medical marijuana pursuant to a state statutory scheme that was originally endorsed by 62 percent of Montana voters. Thus, there is a strongly held belief among those in the medical marijuana community that the federal government has not treated them fairly. This sense of injustice has been well articulated in the Defendants' briefing and oral argument, and the Court understands and acknowledges their position.

Legal arguments are not presented and decided in a vacuum, however. Appeals to the Court's sense of fairness and equity must be tethered to an applicable legal theory, and must seek a remedy that the Court is able to provide. It is against this practical measure that the Defendants' otherwise compelling arguments ultimately come up short. The facts simply do not satisfy the elements of the various theories advanced by the Defendants.

The Court is not empowered or inclined to second-guess the legitimate exercise of the prosecutorial discretion vested with the United States Attorney. And it should be emphasized that the Defendants in this case are not terminally ill cancer or HIV/AIDS patients using physician-prescribed marijuana for palliative relief in full compliance with the MMMA or MMA. As near as the Court can tell, the federal government has been true to its word and not chosen to prosecute

Montana citizens who fall in that category.

Nor is this the appropriate venue in which to attempt to revolutionize and change long-standing federal drug policy as it relates to marijuana. It is the role of this Court to decide the legal issues presented in this matter without passion or prejudice. Thus, the decision that follows is what the law requires. Considerations beyond that are left to the political branches, where they may be resolved in accordance with the will of the people.

## II. Background

Defendants Jason Washington, Darin Mower, Gregory Zuckert, Steven Sann, Lisa Fleming, Jesse Shewalter, and Christopher Cronshaw are charged in Count I of the Indictment with conspiracy to manufacture and distribute more than 100 marijuana plants in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count II alleges that Defendants Washington and Cronshaw possessed with intent to distribute more than 100 marijuana plants in violation of 21 U.S.C. § 841(a)(1). Similar charges of possession with intent to distribute more than 100 marijuana plants are levied against Defendants Mower and Zuckert in Counts III and IV, respectively. Count V charges Defendant Washington with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). The Indictment also includes forfeiture allegations against

Defendants Sann, Washington, and Mower.

Each of the marijuana charges carries a five-year mandatory minimum prison sentence.  The firearm charge against Washington carries a five-year mandatory minimum sentence of imprisonment consecutive to any sentence imposed on any drug charge.  Defendants Mower, Zuckert, Shewalter and Cronshaw have entered guilty pleas but have not been sentenced.  Defendants Mower and Shewalter pled guilty to lesser charges that do not carry mandatory minimum sentences.  Defendants Cronshaw and Zuckert pled guilty to the Count I conspiracy in exchange for the government's promise to dismiss Counts II and IV against them, respectively.

The three remaining Defendants have filed dozens of motions, which can be roughly assigned to one of the following categories: motions to suppress, motions to dismiss on estoppel grounds, motions to dismiss on constitutional grounds, motions relating to discovery, motions in limine, and Defendant Sann's motion to sever.  The parties presented oral argument and extensive evidence in the form of exhibits and witness testimony in support of their motions during a two-day hearing held on August 6 and 7, 2012.  The Court's analysis addresses the motions collectively where possible, and individually where necessary.

## III.  Analysis

**A.  Motions to suppress evidence obtained through electronic surveillance by Defendants Fleming (Doc. No. 153) and Washington (Doc. No. 180)**

The government's investigation of these Defendants included the use of electronic surveillance in the form of a wiretap on Defendant Washington's cellular telephone.  A wiretap is an investigative tactic not generally available to federal agents.  Permission to rely on electronic surveillance may only be obtained by court order, and requires strict adherence to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. §§ 2510-2522.  United States v. Kalustian, 529 F.2d 585, 588 (9th Cir. 1976).  Among other provisions, the Title III statutes require that an application for a wiretap demonstrate the necessity of such surveillance, that the application be reviewed and approved by a statutorily qualified official within the Department of Justice, and that any recordings be immediately sealed upon expiration of the order authorizing the wiretap.  The Defendants argue the government failed to meet all three of these requirements, any one of which, if unsatisfied, is grounds for suppression of all evidence obtained through or derived from electronic surveillance.

### 1.  Necessity

Every wiretap application must contain "a full and complete statement as to

whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).  Similarly, the judge to whom a wiretap application is presented may authorize the interception only upon making a finding that, *inter alia*, "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  The test for measuring compliance with the necessity requirement calls for a two-step analysis.  United States v. Garcia-Villalba, 585 F.3d 1223, 1228 (9th Cir. 2009).  First, the district court must review whether the application contains a "full and complete statement" of the relevant facts related to the investigation.  Id.  If the court finds the application contained a sufficient statement of facts, it must then review the issuing judge's finding that the wiretap was necessary.  Id.  Defendant Fleming's argument goes to both steps of the analysis; she contends that the application omitted important facts, and that if all of the facts had been presented to the issuing judge the application would have failed to show necessity. Defendant Washington focuses on the second step, arguing that the application as presented failed to demonstrate necessity.

### a.     Full and complete statement

An application for electronic surveillance must state the relevant facts by

describing the investigative efforts and results with a reasonable degree of "case-specific detail." Garcia-Villalba, 585 F.3d at 1228. Boilerplate recital of the shortcomings inherent in certain common investigative techniques is not enough. United States v. Blackmon, 273 F.3d 1204, 1210 (9th Cir. 2001).

The application in this case contains a full and complete statement of the material facts in reasonable case-specific detail. The supporting affidavit describes the facts known to the investigating agents and discusses the use of search warrants, pen registers and trap and trace data, confidential sources, controlled purchases, physical surveillance, interviews, trash searches, and financial records. The affidavit explains how each of these techniques was used in the investigation of the alleged conspiracy, what evidence was derived from each technique, and the limits of each technique as applied in this case. The affidavit also explained why some investigative tools, such as undercover agents and grand jury investigation, were not attempted prior to seeking permission to engage in electronic surveillance.

Defendant Fleming lists several facts the she contends were wrongfully omitted from the wiretap application. See Doc. No. 153 at 19-20.[1] She argues the

---

[1]Unless unavailable, all citations to documents in the record refer to the page numbers generated by the Court's CM/ECF electronic filing system.

agents neglected to inform the issuing court that they had access to documents related to the operation of the medical marijuana venture, including state incorporation records, state and federal tax records, state regulatory filings, patient lists, and caregiver forms. She claims agents also failed to inform the issuing court that they could purchase multiple-pound quantities of marijuana from the Defendants either at dispensaries or through Defendant Washington, that they had located the personal and business bank accounts of the Defendants, that they were aware of multiple locations where the Defendants were growing and storing marijuana, and that they could have obtained a great deal of information by executing search warrants on the known dispensaries and growing sites associated with the medical marijuana venture.

The essence of Fleming's argument is that because the Defendants were operating an open and obvious medical marijuana business in violation of federal law, no further investigation of their activities was called for. This misstates the scope of the investigation. The facts presented in the affidavit demonstrate that the agents had legitimate reason to believe that Defendant Washington was regularly purchasing bulk quantities of marijuana from local sources and suppliers outside of Montana to provide inventory for sales on the black market and to other medical marijuana caregivers. Merely apprehending the principals in the medical

marijuana venture would not have been helpful in accomplishing the broader objectives of the investigation.

Moreover, contrary to Defendant Fleming's assertion, most of these facts were communicated to the issuing court in the affidavit supporting the wiretap application. The affidavit discusses financial records and other filings with the State of Montana, and very clearly explains that the Defendants were operating a medical marijuana venture and selling out of a storefront in Missoula the location of which was known to the agents. The affidavit also describes controlled purchases of marijuana in quantities exceeding those allowed by state law. Agents obtained at least one search warrant prior to seeking authorization for a wiretap, and the fruits of that warrant are discussed in detail in the affidavit. The affidavit further acknowledges that search warrants are an investigative option, but explains that search warrants would not be useful in achieving the broader goals of the investigation, including identifying Defendant Washington's suspected sources of bulk marijuana.

The only information that was known to the agents and not included in the affidavit were the locations of two of Defendant Washington's alleged marijuana growing sites, one at the "Wye" near Missoula, Montana and a second site near Polson, Montana. These omissions were not material, however, because the

investigation was not focused on the Defendants' use of local growing sites to stock their dispensaries.  It is clear from the application that the agents were more concerned about Defendant Washington's alleged bulk purchases and bulk sales to other dealers than about the scope of his own grow operation.  The execution of search warrants on the growing facilities would not have led to information on imports and bulk purchases and sales.

Having determined that the application contains a full and complete statement of facts, the Court now turns to the question of whether the facts support a finding that the wiretap was necessary.

### b.    Was the wiretap necessary?

Necessity must be evaluated under a common-sense approach.   United States v. Reed, 575 F.3d 900, 909 (9th Cir. 2009).  The standard requires the application to set forth facts showing that normal investigative techniques using a normal amount of resources have failed to make the case within a reasonable period of time.  United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir. 2000).  Necessity should be viewed in light of the government's need not just to collect some evidence, but to develop an effective case, i.e., a case sufficient to secure a conviction.  Reed, 575 F.3d at 909; Garcia-Villalba, 585 F.3d at 1228.  While a wiretap should not be the initial step in an investigation, agents need not have

exhausted every conceivable traditional alternative in order to obtain a wiretap. United States v. Forrester, 616 F.3d 929, 944 (9th Cir. 2010).  The government is accorded more leeway when investigating conspiracies, because traditional techniques are often insufficient to identify all conspirators.  Reed, 575 F.3d at 910; Garcia-Villalba, 585 F.3d at 1230.

The facts presented in this case demonstrate that the issuing court was well within its discretion to approve the wiretap application.  Federal agents did not use the wiretap as the first step in their investigation, but rather attempted for eight months to achieve their objectives using ordinary techniques before submitting the application.  Those standard techniques were effective to some degree, but had proven incapable of identifying suppliers and revealing the manner and means of supply.  The fact that normal techniques might have succeeded to some degree does not foreclose the necessity of a wiretap, Bennett, 219 F.3d at 1122, and the affidavit explains why that information alone would be insufficient to identify all alleged conspirators and sources of supply.  Confidential sources either had limited knowledge (CS1), had lost Defendant Washington's trust during a botched controlled buy (CS2), or did not know Washington well enough to get close (CS3).  Washington's demonstrated knowledge of task force personnel and vehicles made physical surveillance and undercover agents of little value.  Search

warrants would not have identified all members and might cause them to stop operating, compromising the investigation. Pen registers yielded limited information on supply. Financial records and public filings identified some principals, but were no use in identifying sources of supply and satellite conspirators.

These case-specific reasons meet the standard for necessity under Ninth Circuit precedent, which has upheld a necessity finding where "1) continued surveillance was not feasible due to [the suspects'] use of countersurveillance; 2) the use of a search warrant or grand jury proceeding would alert [the suspects] of an ongoing investigation; 3) informants and undercover agents could not determine the source of [the] drugs." Garcia-Villalba, 585 F.3d at 1231 (quoting United States v. Torres, 908 F.2d 1417, 1422 (9th Cir. 1990)). The same circumstances are present here.

The Defendants rely on Blackmon to support their contention that the government has filed to show necessity, but the facts of Blackmon are readily distinguishable. To begin, the necessity section of the application in Blackmon was lifted almost verbatim from a prior wiretap application relating to a different suspect, and the court found that virtually no new investigation had occurred between the two applications. 273 F.3d at 1206. The appellate panel also

identified numerous material misstatements and omissions in the application, prompting the conclusion that the full and complete statement requirement of 18 U.S.C. § 2518(1)(c) was not met. <u>Id.</u> at 1208-10. After striking the various misstatements, the <u>Blackmon</u> court reviewed the remaining assertions in the affidavit, which contained little more than boilerplate discussion of the inherent limitations of certain investigative procedures, and concluded that the purged application failed to show necessity. <u>Id.</u> at 1210-11.

The facts of this case are entirely different. Here, the investigation was targeted at the these Defendants for several months, and little if any information in the application was obtained through other investigations. There are no material misstatements or omissions in the application, and there is extensive discussion of the methods and progress of the investigation. The Defendants rightly observe that the affidavit is not entirely free of the sort of boilerplate language that was rejected in <u>Blackmon</u>. Unlike the application in <u>Blackmon</u>, however, the affidavit in this case also contains a great deal of case-specific information. "The presence of conclusory language in the affidavit will not negate a finding of necessity if the affidavit, as a whole, alleges sufficient facts demonstrating necessity." <u>Torres</u>, 908 F.2d at 1423.

The wiretap application contains a full and complete statement of facts

which support's the issuing court's finding of necessity.  The motions to suppress based on failure to comply with the necessity requirement are denied.

## 2.    Authorized official

Each application for a wiretap must identify for the reviewing judge the Department of Justice official who authorized the application.  18 U.S.C. § 2518(1)(a).  The class of individuals who may authorize a wiretap application is limited by statute; the authorization must come from the Attorney General, or from certain other high-ranking officials who have been designated by the Attorney General.  18 U.S.C. § 2516(1).  Deputy Assistant Attorneys General in the Criminal Division are statutorily eligible for designation to authorize wiretap applications.  Id.  Current Deputy Assistant Attorneys General in the Criminal Division have been designated as authorizing officials for wiretap applications under Department of Justice Standing Order No. 3055-2009, a publicly available document dated February 26, 2009 and signed by Attorney General Eric Holder.

A wiretap application that does not identify a qualified authorizing official within the Department of Justice is insufficient on its face, and any evidence derived therefrom must be suppressed.  18 U.S.C. § 2518(10)(a)(ii); United States v. Lomeli, 676 F.3d 734, 741-42 (9th Cir. 2012).  Defendant Fleming argues that the intercepted communications and derivative evidence must be suppressed for

failure to identify a qualified authorizing official.

However, the applications in this case contained authorization memoranda signed by Deputy Assistant Attorneys General in the Criminal Division Jacob Weinstein and Kenneth Blanco.   Doc. Nos. 212-1 & 212-2.  Each authorization memorandum referred to Standing Order No. 3055-2009 by order number and date, and stated that "the undersigned" is a duly designated official under the standing order.  Id.  Fleming relies on Lomeli to argue that the applications are facially invalid because Standing Order No. 3055-2009 was not attached to the applications.  The argument is unpersuasive.

Lomeli was a case in which the application did not identify *any* authorizing Department of Justice official. The application in Lomeli merely stated that "an appropriate official of the Criminal Division" had given authorization.  676 F.3d at 737.  Here, the authorizing officers were identified by name and had in fact been duly designated.  Nothing in 18 U.S.C. § 2518 requires that the reviewing judge be provided the document designating the authorizing official, and Fleming has cited no other authority for such a requirement.  It was enough for the authorization memoranda to refer to the publicly available Standing Order by number and date. The motion to suppress based on failure to identify an authorized approving official is denied.

### 3. Sealing

Defendant Fleming argues that the wiretap evidence should be suppressed because the agents failed to arrange for the immediate sealing of the recordings. Section 2518(8)(a) requires recordings to be made available to the authorizing judge for sealing "[i]mmediately upon the expiration of the period of the order," which has been interpreted to require sealing within one to two days. <u>Reed</u>, 575 F.3d at 913. Any delay in excess of one or two days requires suppression unless the government explains why the delay occurred and gives a satisfactory explanation for why the delay is excusable. <u>United States v. Ojeda Rios</u>, 495 U.S. 257, 265 (1990). Multiple causes for delay may be considered together. <u>United States v. Pedroni</u>, 958 F.2d 262, 266 (9th Cir. 1992). The length of the delay is not a dispositive factor and delays of up to 118 days have been excused. <u>Id.</u> A delay is more likely to be excused if the government took proper steps to insure integrity of the recordings during the delay. <u>United States v. McGuire</u>, 307 F.3d 1192, 1204 (9th Cir. 2002). Potentially satisfactory reasons for delay include unavailability of the supervising judge, <u>Pedroni</u>, 958 F.2d at 266; shortage of resources or personnel, <u>id.</u>; or an objectively reasonable belief on the part of the government that the delay was authorized by law. <u>United States v. Hermanek</u>, 289 F.3d 1076, 1088 (9th Cir. 2002). If the government acts pursuant to a court order

postponing sealing, reliance on the order weighs heavily in favor of finding the explanation for the delay satisfactory. <u>McGuire</u>, 307 F.3d at 1204.

In this case the government failed to comply with the immediate sealing requirement, but has provided a satisfactory explanation for the four-day delay between the termination of electronic surveillance on November 18, 2011, and the issuance of an order sealing the recording on November 22, 2011.

The intercepted communications were recorded on a server physically located in Denver, Colorado, at the DEA divisional headquarters for the division covering Colorado, Wyoming, Montana, and Utah. The wiretap was terminated on the afternoon of Friday, November 18, 2011. DEA agents then burned the recordings onto Blu-ray disks and placed the disks in an evidence bag, sealing the bag and signing it in front of a witness. The evidence bag was then shipped that afternoon via FedEx to Special Agent Bryan Fillinger, the lead agent in this case, in Missoula, Montana. The shipment arrived in Missoula on Monday, November 21, 2011. The government filed a motion seeking to appear before the issuing court for sealing on November 21, 2011, but the approving court issued an order on that date stating that it was not available to supervise the sealing that day and directing the government to present the recordings for sealing on November 22, 2011, at which time the approving court entered an order sealing the recordings.

The recordings were stored in a safe in Special Agent Fillinger's office from November 21 to November 22.

The foregoing facts constitute a satisfactory explanation for the four-day interval between the termination of electronic surveillance and the sealing of the recordings by the approving court. The agents shipped the recordings the day the wiretap ended, and the government was prepared to present them for sealing on the day they arrived in Missoula. The DEA's choice to record the communications to a server at its divisional headquarters in Denver is reasonable, and were it not for the fact that the shipping occurred over a weekend the recording likely would have been in Missoula the day after the wiretap was terminated. The approving court was unavailable on November 21, and the government appropriately relied on the approving court's order delaying presentation for sealing until the next day. The government at all times took appropriate steps to insure the integrity of the recordings through secure sealing and storage. The delay was brief, it occurred for satisfactory reasons, and the quality of the electronic evidence was not jeopardized. The motion to suppress for failure to timely seal the recordings is denied

**B.      Motions to dismiss on estoppel grounds:  Defendants Fleming and Sann's motions to dismiss under the doctrine of judicial estoppel (Doc. Nos. 150, 155); Defendants Sann and Washington's motions to dismiss**

**based on estoppel by official misleading (Doc. Nos. 156, 182); Defendant Sann's motion to dismiss based on promissory estoppel (Doc. No. 154)**

All of the pending motions to dismiss on estoppel grounds rely on the common underlying principle that the federal government, having stated several times that it would not initiate federal drug prosecutions of sellers or users of medical marijuana acting in compliance with the laws of their respective states, should now be estopped from pursuing this federal prosecution in contradiction of those statements. The most prominent of the federal government's various pronouncements on the topic of medical marijuana is what has become known as the "Ogden memo."

Written by Deputy Attorney General David Ogden and issued on October 19, 2009, the Ogden memo purports to "provide[] clarification and guidance to federal prosecutors in States that have enacted laws authorizing the medical use of marijuana." Ogden memo (Doc. No. 196-1 at 1). In the Ogden Memo, the Department of Justice communicated to its attorneys that certain marijuana users and providers would be a lower priority for prosecution than others. Id. at 1-2 ("As a general matter, pursuit of [the Department's] priorities should not focus federal resources in your States on individuals whose actions are in clear and unambiguous compliance with existing state laws providing for the medical use of

marijuana.").  However, the Ogden memo also made clear that medical marijuana

activity that may be authorized under state law remains illegal under federal law:

> The Department of Justice is committed to the enforcement of the
> Controlled Substances Act in all states.  This guidance regarding
> resource allocation does not 'legalize' marijuana or provide a legal
> defense to a violation of federal law, nor is it intended to create any
> privileges, benefits, or rights, substantive or procedural, enforceable
> by any individual, party, or witness in any administrative, civil, or
> criminal matter.  Nor does clear and unambiguous compliance with
> state law. . . create a legal defense to a violation of the Controlled
> Substances Act.

Id. at 2.  The Ogden memo did not state that medical marijuana users and

providers would be exempt from prosecution.  Id. at 2-3 ("Nor does this guidance

preclude investigation or prosecution, even where there is clear and unambiguous

compliance with existing state laws, in particular circumstances where

investigation or prosecution otherwise serves important federal interests.").

As the Court has stated previously, the analysis of these pending motions

proceeds under the assumption that the Defendants in this case acted in

compliance with state law at all times relevant to the conduct charged in the

Indictment.

### 1.      Judicial estoppel

The Defendants seek to invoke the doctrine of judicial estoppel based on the

government's entry into a stipulation to dismiss a civil case against it in County of

<u>Santa Cruz v. Holder</u>, No. C 03-1802 JF (N.D. Cal. 2009), a federal district court case in California. The plaintiffs in <u>Santa Cruz</u> sought to enjoin federal raids and seizures against suppliers and users of medical marijuana, but stipulated to dismiss upon the issuance of the Ogden memo. The stipulation was filed pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and stated that, "As a result of the issuance of the [Ogden memo], plaintiffs agree to dismiss this case without prejudice." <u>Santa Cruz</u>, No. C 03-1802 JF, Doc. No. 223 at 1. The stipulation further provided that "if Defendants withdraw, modify, or cease to follow the [Ogden memo], this case may be reinstituted in its present posture[.]" <u>Id.</u> at 2. The parties filed the signed stipulation with a blank signature line for the presiding judge, and the same document was re-filed four days later with the judge's signature. <u>Santa Cruz</u>, No. C 03-1802 JF, Doc. No. 225.

The Defendants argue that the Department of Justice, having obtained a stipulation to dismiss the <u>Santa Cruz</u> matter based on the issuance of the Ogden memo, should be judicially estopped from bringing prosecutions against the Defendants in this Court because they were lawful medical marijuana suppliers under Montana law.

The doctrine of judicial estoppel is intended to protect the integrity of the judicial process by prohibiting a party from gaining an advantage in litigation by

one theory and then seeking an inconsistent advantage by later pursuing an incompatible theory. Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001). Judicial estoppel is an equitable remedy the application of which is left to the discretion of the district court. Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990). Among the factors to be considered are: 1) whether a party has taken a position that is clearly inconsistent with its earlier position; 2) whether the party succeeded in persuading the court to adopt its earlier position; and 3) whether, in the absence of estoppel, the party seeking to assert an inconsistent position would "derive an unfair advantage or impose an unfair detriment on the opposing party[.]" New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001).

The Defendants' argument for dismissal under the doctrine of judicial estoppel based on the events in Santa Cruz was squarely rejected by the court in Marin Alliance for Medical Marijuana v. Holder, 2011 WL 5914031 (N.D. Cal. Nov. 28, 2011) ("Marin I"), and a subsequent unreported order dated July 10, 2012, in the same case. Marin, No. C 11-05349 SBA, Doc. No. 52 ("Marin II"). This Court finds the reasoning in Marin I and Marin II to be persuasive in all respects.[2]

---

[2]The Court shares the Marin court's skepticism of the availability of the doctrine of judicial estoppel against the government, particularly in a case such as this where the government is pursuing its interest in enforcing the law. Marin I, 2011 WL 5914031 at 8 (citing New

None of the three factors articulated by the Supreme Court in New Hampshire favors the application of judicial estoppel in this case.  To begin, there is no clear inconsistency between the position taken by the government as a civil defendant in Santa Cruz and the government's decision to charge the Defendants in this case with federal drug crimes.  The stipulation filed by the parties in Santa Cruz merely states that the plaintiffs agree to dismiss their case in light of the Ogden memo, and unambiguously contemplates that the government may "withdraw, modify, or cease to follow" the Ogden memo at a later date.  The Odgen memo makes clear that the federal government retains the discretion and authority to prosecute violations of federal laws prohibiting marijuana, and does not grant any person or class of persons immunity from federal prosecution.

Defendants argue that the essence of their judicial estoppel case is not in the Ogden memo itself, but rather in statements made to the Santa Cruz court in a hearing held on October 30, 2009.  The Court has reviewed a transcript of that hearing, see Doc. No. 294-2, and concludes that the assistant United States Attorney did not make any statements suggesting that the government's policy

Hampshire, 532 U.S. at 755, and Heckler v. Cmty. Health Servs., Inc., 467 U.S. 51, 60 (1984)).
However, because the Court finds no basis to invoke the doctrine of judicial estoppel under the facts of this case, it is unnecessary to resolve the question of the applicability of judicial estoppel against the United States in this context.

affords any more protection to people involved with medical marijuana than is offered in the Ogden memo. To the extent that Defendants rely on statements of the court during hearings in the Santa Cruz case, that reliance is misplaced. What matters for purposes of judicial estoppel is what positions the government has actually taken in prior litigation; the Santa Cruz court's characterizations of the government's positions are irrelevant to this Court's evaluation of the consistency of the government's arguments. The government in Santa Cruz promised to do nothing more than follow the Ogden memo until it changed its mind. The instant prosecution is not incompatible with that promise.

The Defendants have also failed to show that the United States succeeded in persuading the Court to adopt its position, which is a requirement in the Ninth Circuit. Hamilton, 270 F.3d at 783 ("This court has restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position."). The parties in Santa Cruz filed their signed Joint Stipulation of Dismissal Without Prejudice without the court's signature on January 21, 2010. Santa Cruz, No. C 03-1802 JF, Doc. No. 223. By its own terms the stipulation was filed under Fed. R. Civ. P. 41(a)(1)(A)(ii),[3] which does

---

[3]The stipulation refers to "Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure." Santa Cruz, No. C 03-1802 JF, Doc. No. 223 at 1. The Court assumes that the parties erroneously omitted subparagraph (A) from the citation to Fed. R. Civ. P. 41(a)(1)(A)(ii), which

not require an order of the court for dismissal to take effect. Thus, while the <u>Santa Cruz</u> court ultimately re-filed the stipulation with its signature added, there was no legal effect to doing so. It cannot be said under these circumstances that the government gained any advantage by persuading the court to adopt its position. Moreover, assuming the court "accepted" the government's position, that means nothing more than that the court accepted the government's statement that it agreed to follow the Ogden memo or be subject to the resumption of that civil litigation.

Finally, assuming there is some inconsistency between the government's positions in <u>Santa Cruz</u> and this case, the Defendants have not demonstrated that they have suffered any unfair detriment caused by the government's change in position. These Defendants were not plaintiffs in the underlying action. Defendant Sann testified that he became aware of the stipulation to dismiss in <u>Santa Cruz</u> through news reports while traveling on the West Coast, but conceded that he has not reviewed any documents in the case. Defendants argue that privity of the parties has not been deemed a prerequisite to the application of the doctrine of judicial estoppel in the Ninth Circuit, and while that may be true,[4] it does little

applies to stipulations of dismissal signed by all parties.

[4] <u>But see</u> <u>State of Ariz. v. Shamrock Foods Co.</u>, 729 F.2d 1208, 1215 (9th Cir.1984) ("A plaintiff who has obtained relief from an adversary by asserting and offering proof to support one

to bolster the argument for judicial estoppel in this case. The Defendants here were either unaware of the <u>Santa Cruz</u> case or knew of it solely through news reports, thus standing them in similar stead with every other non-party in the United States. Courts may be willing, in some instances, to accept something less than complete privity, but this Court is unwilling to assign a special interest in litigation to every person who happens to come across a news story about the case.

These Defendants had no personal stake in the <u>Santa Cruz</u> litigation. To the extent they made choices based on the stipulation in <u>Santa Cruz</u> (and there is nothing in the record to suggest they did), those choices were well beyond the contemplation of the parties and court in that case.

Even if they could establish equal footing with the plaintiffs in <u>Santa Cruz</u>, the Defendants would fare no better in showing that they have been unfairly disadvantaged by being charged under federal law. The stipulation in <u>Santa Cruz</u> explicitly left open for the government the option of abandoning the policy set forth in the Ogden memo, and prescribed that the only remedy available to the plaintiffs is the revival of their civil complaint. Thus, not even the plaintiffs in <u>Santa Cruz</u> have any basis to believe they are immune from federal prosecution.

---

position may not be heard later in the same court to contradict himself in an effort to establish *against the same adversary* a second claim inconsistent with his earlier contention.") (emphasis added) (internal quotation marks omitted).

And contrary to Defendant Sann's assertion, the stipulation in <u>Santa Cruz</u> did not require the government to provide notice of any kind before taking action inconsistent with the Ogden memo.

The doctrine of judicial estoppel is intended to "protect the integrity of the judicial process" by preventing litigants from "playing fast and loose with the courts." <u>Russell</u>, 893 F.2d at 1037 (internal quotation marks, citations omitted). As the application of the relevant considerations reveals, that is not what the government has done here. The facts do not support the Court's exercise of its discretion to invoke the equitable doctrine of judicial estoppel, and the Defendants' motions to dismiss on that basis are denied.

### 2. Estoppel by official misleading statement

Estoppel by official misleading statement is also referred to in the Ninth Circuit as entrapment by estoppel. <u>United States v. Batterjee</u>, 361 F.3d 1210, 1216 n.6 (9th Cir. 2004). It applies where the defendant had a "reasonable belief that his conduct was sanctioned by the government." <u>United States v. Burrows</u>, 36 F.3d 875, 882 (9th Cir. 1994). The defense requires the accused to show that "(1) an authorized government official, empowered to render the claimed erroneous advice, (2) who has been made aware of all the relevant historical facts, (3) affirmatively told him the proscribed conduct was permissible, (4) that he relied on

the false information, and (5) that his reliance was reasonable." Batterjee, 316

F.3d at 1216 (citations, internal quotation marks omitted).

The Defendants assert the defense of estoppel by official misleading statement based on the Ogden memo; statements made to the press or to Congress by then-presidential-candidate Barack Obama, his campaign spokesman, his White House spokesman, and United States Attorney General Eric Holder; the characterizations of those statements in news media; the government's entry into the stipulation in Santa Cruz; and statements made to at least one Defendant by Flathead Tribal Police drug investigator Arlen Auld. None of these statements justifies dismissal on a theory of estoppel by official misleading statement.

### a. Odgen memo

Prior rulings in similar cases in this District have held that the defenses of estoppel by official misleading statement or entrapment by estoppel are not available as they relate to the Ogden memo. United States v. Janetski, CR 11-37-M-DWM, Doc. No. 45 at 6 (D. Mont. Sept. 1, 2011); Montana Caregivers Ass'n, LLC v. United States, 841 F. Supp. 2d 1147, 1148-49 (D. Mont. 2012). The Ogden memo fails to satisfy most of the elements set out in Batterjee, but it is most obviously inconsistent with the third element, which requires a showing that an authorized official affirmatively advised the accused that proscribed conduct is

permissible.  Judge Molloy explained why in <u>Janetski</u>:

> An entrapment by estoppel defense requires, among other things, an affirmative statement by an authorized official that the defendant's conduct was lawful under federal law.  <u>See</u> <u>Ramirez-Valencia</u>, 202 F.3d at 1109 (finding defendant's reliance on an INS Form could not support the defense because the form "did not expressly tell [him] that [his conduct] was lawful").  The Ogden Memo only provides a prosecution policy and in no way indicates that Janetski's conduct was permissible under federal law.  To the contrary, the Memo explains that its "guidance regarding resource allocation does not 'legalize' marijuana or provide a legal defense."  Ogden Memo at 2.  Moreover, the Memo explains that nothing in it precludes investigation or prosecution, "even when there is clear and unambiguous compliance with existing state law."  <u>Id.</u> at 3.  Because the Ogden Memo does not provide a statement that Janetski's charged conduct was permissible under federal law, it cannot, as a matter of law, support an entrapment by estoppel defense.

<u>Janetski</u>, CR 11-37-M-DWM, Doc. No. 45 at 5-6.

The Ogden memo does not support dismissal based on estoppel by official misleading or entrapment by estoppel, and the Defendants may not rely on the Ogden memo for such a defense at trial.  <u>See</u> <u>United States v. Schafer</u>, 625 F.3d 629, 637 ("A district court may preclude evidence of a particular defense if the defendant fails to make a prima facie showing that he is eligible for the defense.").

### b.    Newspaper articles and press releases

The Defendants cannot claim to have reasonably relied on any statements made by journalists or authors of press releases.  Such individuals are not

"authorized government official[s], empowered to render the claimed erroneous advice" as required by Batterjee. 316 F.3d at 1216. Moreover, when it comes to assessing the risk that one's conduct might violate federal criminal law, it is perilous and unreasonable for any person to rely on press accounts given the risk of inaccuracy and overstatement. (For example, consider these headlines: Americans for Safe Access, press release, *U.S. Supreme Court: State Medical Marijuana Laws Not Preempted by Federal Law* (Dec. 1, 2008), Doc. No. 183-1 at 13; M. Alex Johnson, *DEA to Halt Medical Marijuana Raids*, MSNBC.com (Feb. 27, 2009), id. at 17; David Johnston and Neil A. Lewis, *Obama Administration to Stop Raids on Medical Marijuana Dispensers*, New York Times (March 19, 2009), id. at 20; Josh Meyer and Scott Glover, *Medical Marijuana Dispensaries Will No Longer be Prosecuted, U.S. Attorney General Says*, Los Angeles Times (Mar. 19, 2009), id. at 25; Tristan Scott, *Feds Won't Arrest Medical Marijuana Patients, Suppliers in Montana, 13 Other States*, Missoulian (Oct. 20, 2009), id. at 30.) Nor are newspapers' interpretations of official statements entitled to deference; an official may be misquoted, quoted out of context, or misinterpreted. Thus, the news articles cited by Defendants do not provide support for a defense of entrapment by estoppel or estoppel by official misleading.

### c.    Santa Cruz

It has been established in Part III.B.1 of this Order that by entering into a stipulation to resolve the <u>Santa Cruz</u> case, the United States made no guarantees outside of those contained in the Ogden memo.  Nothing that occurred in <u>Santa Cruz</u> can be plausibly construed as a statement affirmatively telling these Defendants that federal law allows them to grow and sell marijuana.  Because the Ogden memo does not give rise to a defense of estoppel by official misleading, the government's position in <u>Santa Cruz</u> is also insufficient to support such a defense.

### d.    Policy statements by campaign and administration officials

Defendants claim they relied on statements made during the 2008 presidential campaign by then-Senator Barack Obama and his campaign spokesman, as well as on statements made by President Obama's White House spokesman and Attorney General Eric Holder.  As is noted above, to the extent that the statements are merely paraphrased in media reports, those reports are not statements of government officials as required for the defense of entrapment by estoppel or official misleading.

The remaining statements describe the campaign's or administration's policy position on the prioritization of marijuana enforcement under federal law. The Oregon Mail Tribune quoted then-presidential-candidate Senator Obama as

stating: "I'm not going to be using Justice Department resources to try to circumvent state laws on this issue." Doc. No. 183-1 at 7. The San Francisco Chronicle quoted his campaign spokesman as stating: "Obama supports the rights of states and local governments to make this choice—though he believes medical marijuana should be subject to [United States Food and Drug Administration] regulation like other drugs." Id. at 10.

After President Obama took office, his White House spokesman Nick Shapiro was quoted in the Washington Times responding to DEA raids of medical marijuana collectives in California: "The President believes that federal resources should not be used to circumvent state laws, and as he continues to appoint senior leadership to fill out the ranks of the federal government, he expects them to review their policies with that in mind." Doc. No. 183-1 at 15. Cable news network MSNBC reported on its website that Attorney General Eric Holder stated at a press conference that "[w]hat the president said during the campaign . . . will be consistent with what we will be doing here in law enforcement . . . . What [Obama] said during the campaign . . . is now American policy." Id. at 17.

Defendants point to additional statements made by Attorney General Holder and other Justice Department officials to the press and Congress in the wake of the Ogden memo. For example, the Attorney General is quoted as saying:

The policy is to go after those people who violate both federal and state law, to the extent that people do that and try to use medical marijuana laws as a shield for activity that is not designed to comport with what the intention was of the state law. . . . Those are the organizations, the people, that we will target. And that is consistent with what the president said during the campaign.

Meyer & Glover, Los Angeles Times, Doc. No. 183-1 at 27. The same article quotes another Justice Department official stating, "If you are operating a medical marijuana clinic that is actually a front, we'll come after you. . . . But if you are operating within the law, we are not going to prioritize our resources to go after them." Id. At times, Attorney General Holder clearly stated that prosecutions of people acting in compliance with state law would be deprioritized. In other instances, he made broader statements that suggested more than mere deprioritization. See, e.g., id. at 35 ("[W]e will not use federal resources to target medical marijuana patients or their providers.").

These statements fail to support a defense of estoppel by official misleading for several reasons. First, the variation in the content of the statements would have put a reasonable person on notice to make further inquiries. United States v. Lansing, 424 F.2d 225, 227 (9th Cir. 1970) (requiring a defendant to show "that his reliance on the misleading information was reasonable—in the sense that a person sincerely desirous of obeying the law would have accepted the information

as true, and would not have been put on notice to make further inquiries"). The Ogden memo was the official, written statement of the administration's policy. As already held, no reasonable person would conclude from that document that he had immunity against federal prosecution for the distribution of marijuana for medical purposes. The fifth element of the Batterjee test is therefore unmet.

The public statements by federal officials also fail to satisfy the second element of the Batterjee test. There is nothing in the record to suggest that the quoted officials had any knowledge whatsoever of the Defendants' contemplated course of action, and thus it cannot be said that any federal official was fully aware of the relevant historical facts.

Nor do the statements Defendants claim to have relied on meet the third element of Batterjee. The Defendants point to no incident where a government official affirmatively stated or strongly implied that distribution of medical marijuana is lawful. Instead, Defendants argue that they need not identify an authorized official's affirmative statement that the conduct in question is legal; it is sufficient, they contend, for an authorized official state merely that the conduct will not result in prosecution.

The case law is contrary to the Defendants' position. In Raley v. Ohio, 360 U.S. 423 (1959), four witnesses were convicted in a contempt prosecution for

failure to answer certain questions before their state legislature's "Un-American Activities Commission."  Id. at 424.  The United States Supreme Court reversed the convictions based upon its finding that the commission had misled the witness by advising them that they had a right to rely on a privilege against self-incrimination that did not in fact exist under Ohio law.  Three of the witnesses were affirmatively told by commission members that the privilege was available to them.  Id. at 426-27, 429 (quoting the commission's chairman stating, "I should like to advise you under the Fifth Amendment, you are permitted to refuse to answer questions that might tend to incriminate you.").  It was strongly implied to the fourth person that the privilege existed as well.  Id. at 430.  The Ohio Supreme Court upheld the convictions on the grounds that under Ohio's immunity statute, the protections of the privilege were not legally available to a person testifying before a legislative committee.  Id. at 431.  The Supreme Court reversed, holding that to do otherwise would "sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him."  Id. at 425–26.

The Supreme Court reached a similar conclusion in Cox v. Louisiana, 379 U.S. 559 (1965).  In that case a police chief and had affirmatively granted a group of demonstrators permission to protest across the street from a courthouse.  Id. at

571. A demonstrator was later convicted of violating a statute that prohibited protesting "near" the courthouse. Id. at 560. The Supreme Court reversed, holding that a demonstrator, having been supplied with the police chief's "on-the-spot administrative interpretation" of the statute, "would justifiabl[y] tend to rely on this administrative interpretation of how 'near' the courthouse a particular demonstration might take place." Id. at 568-69. In explaining its ruling, the Court observed that the appellant had been effectively advised that a protest in that location "would not be one 'near' the courthouse within the terms of the statute." Id. at 571. As in Raley, the "[a]ppellant was led to believe that his [conduct] *violated no statute*." Id. at 572 (emphasis added).

In both Raley and Cox, state actors affirmatively told the defendants, or at least strongly implied, that a specific, individually contemplated course of conduct was lawful. The officials did not merely suggest they would not prosecute the defendants if they broke the law, or that their prosecution would be "deprioritized." Rather, the state actors made affirmative, "actively misleading" statements directly to the defendants that the law permitted them to assert a specific privilege or to protest in a specific place. Raley, 360 U.S. at 438; Cox, 379 U.S. at 571.

Even if statements about the deprioritization of medical marijuana

enforcement and prosecution could constitute the basis for the defense of estoppel by official misleading, the Defendants cite no case law, and the Court finds none, in which a person justifiably relied on an official's comments to a third party.  A direct, targeted statement to a discrete person or group of people appears to be required.  See, e.g., Batterjee, 361 F.3d at 1214 (federal firearms licensee erroneously told defendant, a non-immigrant alien, he could purchase a firearm); United States v. Tallmadge, 829 F.2d 767, 770 (9th Cir.1987) (federal firearms licensee incorrectly told defendant "there was no problem owning a gun" because his felony conviction had been reduced to a misdemeanor); Raley, 360 U.S. at 426–27 (commission members told defendants the privilege against self-incrimination was available to them); Cox, 379 U.S. at 571 (law enforcement officer told defendant he could demonstrate across the street from the courthouse).[5]  The Ogden memo was directed to government attorneys.  The

---

[5]Defendant Sann argues that the public statements by federal officials amount to a conditional public promise that is enforceable under Carlill v. Carbolic Smoke Ball Co., 1 Q.B. 256 (Court of Appeal, 1892), and its progeny.  The cases cited by Sann all involve conditional promises to pay rewards or award prizes if any person successfully performs a certain act.  See, e.g., Grove v. Charbonneau Buick-Pontiac, Inc., 240 N.W. 2d 853, 855 (N.D. 1976) (auto dealer promised a new car to first entrant to shoot hole-in-one at a golf tournament).  None of the cases cited arise in the criminal context, and for good reason.  If such a contract exists here, it looks like this: medical marijuana sellers agree to violate the federal law, and in return federal officials promise that the sellers will not be prosecuted.  This Court will not be the first to expand the conditional public promise concept into the criminal arena, where the only "reward" offered is immunity from the enforcement of the criminal law.

Obama administration's comments concerning the Ogden memo policy were made to the press and Congress. The officials did not affirmatively tell the Defendants that their specific conduct was legal.

Accordingly, the varying statements from Obama Administration officials concerning the federal policy on enforcing and prosecuting marijuana laws as they relate to medical marijuana cannot form the basis for the defense of entrapment by estoppel or estoppel by official misleading.

### e.    Statements by Officer Auld

Arlen Auld is a drug investigator with the Flathead Tribal Police. Officer Auld testified at the hearing on these motions. He described an encounter he had with Defendant Washington and others at a medical marijuana growing site near Polson, Montana, in the fall of 2010 or 2011. Officer Auld–who at the time was a member of the Northwest Drug Task Force–received a call from a member of the High Intensity Drug Trafficking Area Task Force ("HIDTA") in Missoula asking Auld to identify the location of a growing operation. Officer Auld visited the building that housed the operation and met with Defendant Washington and several others, including Washington's attorney at the time. Officer Auld was offered an opportunity to count the plants and inspect records, and upon leaving the growing facility he indicated to Defendant Washington and the others that

"everything looks okay" with respect to the operation. Officer Auld may have also reported back to the Missoula HIDTA that the operation appeared to be in compliance with state law.

Although this statement by Officer Auld is not enough to warrant dismissal of the Indictment on a theory of estoppel by official misleading, the Court nevertheless believes that Officer Auld's involvement presents a question for the jury to resolve in this case. Officer Auld was unable to recall the precise details of his visit to the growing facility, and he did not know the same of the agent who asked him to locate the facility. He was also unsure of the year in which the incident occurred. Moreover, Officer Auld testified that he has never been sworn or cross-deputized as a federal agent. But again, while these circumstances do not warrant outright dismissal of the Indictment, there are enough uncertainties with respect to Officer Auld's visit to the Polson growing facility that the Defendants are entitled to the opportunity at trial to attempt to prove estoppel by official misleading with respect to Officer Auld's statements only. Having failed to make a prima facie showing with respect to any other statements, the Defendants will not be permitted to attempt to establish estoppel by official misleading at trial based on any statements by any official other than Officer Auld. Schafer, 625 F.3d at 637.

### 3. Promissory estoppel

Relying again on the Ogden memo, statements by Attorney General Holder and others, and the stipulation in <u>Santa Cruz</u>, the Defendants argue that the Indictment should be dismissed based on the doctrine of promissory estoppel. Defendants cite no Ninth Circuit authority affirming the availability of promissory estoppel as a defense to criminal charges, but other circuits have entertained promissory estoppel theories in considering the enforceability of agreements made in criminal cases. <u>See, e.g.</u>, <u>Cooper v. United States</u>, 594 F.2d 12, 16 (4th Cir. 1979) (considering defendant's promissory estoppel argument in the context of a plea agreement); <u>United States v. Weaver</u>, 905 F.2d 1466, 1474 (11th Cir. 1990) (discussing promissory estoppel in relation to an immunity agreement).

Under the Ninth Circuit's civil promissory estoppel standard the promisee must show: "(1) the existence of a promise, (2) which the promisor reasonably should have expected to induce the promisee's reliance, (3) which actually induces such reliance, (4) that such reliance is reasonable, and (5) that injustice can only be avoided by enforcement of the promise." <u>Aguilar v. Intl. Longshoremen's Union Loc. No. 10</u>, 966 F.2d 443, 445 (9th Cir.1992). The promise must be "clear and unambiguous." <u>Id.</u> at 446

These elements are not met here. The Ogden memo and public statements

by federal officials are not promises, much less clear and unambiguous ones. The Ogden memo clearly stated it did not authorize medical marijuana activity. The other public statements were not promises but rather statements of "principle and intent in the political realm," Berg v. Obama, 574 F.Supp.2d 509, 529 (E.D.Pa. 2008), which were "vague, general, [and] of indeterminate application." Hass v. Darigold Dairy Prods. Co., 751 F.2d 1096, 1100 (9th Cir. 1985); see also Aguilar, 966 F.2d at 446 ("Even if possible inferences might be drawn from the representations... [that] does not transform them into an enforceable promise."). Nor were any statements made specifically to these Defendants; they have not alleged that any official promised them they would not be prosecuted for violating federal laws, and thus any reliance on the statements was unreasonable. This is particularly true given the contrary will of Congress as exemplified in the Controlled Substances Act. Simply stated, Congress defines the offenses and the Attorney General has broad discretion in enforcing the law. Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978).

The cases Defendants cite involve bilateral contracts such as plea agreements and immunity agreements, not general public statements intended for no particular listener or reader. See, e.g, United States v. Chiu, 109 F.3d 624 (9th Cir. 1997) (proffer agreement); United States v. Anderson, 970 F.2d 602, 606 (9th

Cir.1992), as amended, 990 F.2d 1163 (1993) (plea agreement); United States v.

Plummer, 941 F.2d 799, 803 (9th Cir.1991) (informal, written immunity

agreement).  The Defendants have not claimed any such agreement exists in this

case.  The doctrine of promissory estoppel does not preclude the federal

government from enforcing its laws in this case, and the motion to dismiss on that

basis is denied.

**C.      Defendant Fleming's motions to dismiss under the Fifth and Tenth
         Amendments (Doc. No. 150, 152)**

**1.      Tenth Amendment**

Defendant Fleming argues that the Indictment should be dismissed because

the charges against her violate her rights under Tenth Amendment of the United

States Constitution.  The Tenth Amendment provides, "The powers not delegated

to the United States by the Constitution, nor prohibited by it to the States, are

reserved to the States respectively, or to the people."  U.S. CONST. amend. X.

Among the powers historically accorded to the states are the police powers to

enact laws regarding of health, safety, and welfare of the population.  Medtronic,

Inc. v. Lohr, 518 U.S. 470, 475 (1996).  Police powers are not, however, an

exclusive domain of the states.  Under the Constitution's Supremacy Clause, U.S.

CONST. art. VI, cl. 2, federal legislation enacted pursuant to constitutionally

derived federal authority trumps a conflicting state law, even if the state law furthers a core police power interest.  Gonzalez v. Raich, 545 U.S. 1, 29 (2005) ("The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail.").

In Raich, the United States Supreme Court held that regulation of even locally grown and consumed marijuana is a permissible exercise of Congress' power to regulate interstate commerce.  545 U.S. at 9.  Accordingly, under the Supremacy Clause of the Constitution there is no viable Tenth Amendment claim based on federal prosecution of marijuana distribution activity that is legal under state law.  Raich v. Gonzalez, 500 F.3d 850, 867 (9th Cir. 2007) ("Raich II"); Montana Caregivers, 841 F.Supp.2d at 1150.

Defendant Fleming argues that these authorities do not preclude her Tenth Amendment claim because her motion to dismiss relied on the line of cases within Tenth Amendment jurisprudence prohibiting federal "commandeering" of the states.  These cases hold that Congress may not "commandeer the legislative processes of the States by directly compelling them to enact and enforce a regulatory program."  New York v. United States, 505 U.S. 144, 161 (quoting Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 288 (1981)).  Nor may it issue directives requiring states to address problems, or

command state officials to administer or enforce a federal regulatory program.

Printz v. United States, 521 U.S. 898, 935 (1997).  The federal government may,

however, attempt to encourage or influence a state to adopt a certain policy,

provided there is no outright coercion and the state retains the ultimate choice as

to what its policy is.  New York, 505 U.S. at 166-68.

The federal government's actions in enforcing its criminal law regarding the

distribution of marijuana—a law that was in place long before Montana adopted

its policy permitting the distribution of marijuana for medicinal purposes—do not

meet the Supreme Court's definition of commandeering.  The federal government

has not required the state of Montana to enact a regulatory program and has not

directed state employees to assist in the enforcement of any such federal measure.

Fleming has offered no support, either in her submission to the Court or at the

hearing on these motions, for her contention that state officials in Montana have

been threatened with federal prosecution for voting for or implementing the state

medical marijuana law.  The voters of Montana continue to retain the ultimate

authority to set their state's policy through their elected representatives, as is

evidenced by the continued decriminalization of medical marijuana under the

Montana Marijuana Act.[6]

In <u>Raich II</u>, the Ninth Circuit cast doubt on the viability of an attack against federal marijuana laws under the commandeering line of cases, explaining that the Controlled Substances Act applies to private individuals and does not require the state to enact any law or require state officials to enforce federal law.  500 F.3d at 867 n.17.  Defendant Fleming relies on the concurrence in <u>Conant v. Walters</u>, 309 F.3d 629, 645-47 (9th Cir. 2002), in which Judge Kozinski concluded that it would be impermissible commandeering for the DEA to revoke the federal prescription license of any doctor who wrote a medical marijuana prescription under California's state law.  Judge Kozinski's concurrence was not the ruling in the case, and it pre-dated <u>Raich</u> and <u>Raich II</u>.  That the concurrence was issued before the <u>Raich</u> cases is an important detail, as the concurrence was based in part on Judge Kozinski's determination, later controverted by the Supreme Court in <u>Raich</u>, that "[m]edical marijuana, when grown locally for personal consumption, does not have any direct or obvious effect on interstate commerce."  <u>Conant</u>, 309 F.3d at 647.

_____

[6]According to the Montana Department of Public Health and Human Services, there were 8,844 registered patients, 399 registered providers, and 224 registered physicians in the state as of July 31, 2012.  Montana Marijuana Program July 2012 Registry Information, mt.gov, http://www.dphhs.mt.gov/ marijuanaprogram/mmpregistryinformation.pdf (last visited August 20, 2012).

The facts do not support the conclusion that the federal government has engaged in impermissible commandeering in this case, and the motion to dismiss on that basis is denied.

**2.     Fifth Amendment**

Defendant Fleming argues the charges against her should be dismissed because the federal government's decision to list medical marijuana as a Schedule I controlled substance violates her right to equal protection under the Fifth Amendment of the United States Constitution.

The standard to be applied in assessing an equal protection challenge depends on the nature of the classification at issue.  Those statutes that infringe upon a fundamental right or discriminate based on a suspect classification are reviewed with strict scrutiny, and will be upheld only where the law in question serves a compelling government interest.  San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 29 (1973); Grutter v. Bollinger, 539 U.S. 306, 326 (2003).  Where the law does not make a suspect classification or infringe upon a fundamental right, the rational basis test applies, and the challenged law will be upheld "if the classification itself is rationally related to a legitimate governmental interest."  Dept. of Agriculture v. Moreno, 413 U.S. 528, 533 (1973).  Defendant Fleming argues that in light of the evolving public attitudes favoring greater legal

access to marijuana for medicinal purposes and scientific studies discussing the medicinal benefits of marijuana and its lack of addictive properties, the designation of medical marijuana as a Schedule I controlled substance is not rationally related to any legitimate federal interest.

In <u>Raich II</u>, the Ninth Circuit explicitly rejected the existence of a fundamental right to use medical marijuana. 500 F.3d at 866. Accordingly, Fleming's challenge is subject to a rational basis review, which is highly deferential. <u>Kahawaiolaa v. Norton</u>, 386 F.3d 1271, 1279 (9th Cir. 2004). The law will be upheld if there is a rational relationship between the classification of marijuana and some legitimate governmental purpose. <u>Moreno</u>, 413 U.S. at 533. As the person challenging the constitutionality of the treatment of marijuana under the Controlled Substances Act, Defendant Fleming bears the burden of negating "every conceivable basis which might support it." <u>Kahawaiolaa</u>, 386 F.3d at 1280 (quoting <u>Heller v. Doe</u>, 509 U.S. 312, 320 (1993)). The law will be upheld if there is a plausible policy reason for the classification, the facts considered by the policymaker were rationally considered to be true, and the relationship between the classification and the policy goal is not so attenuated as to render the classification arbitrary or irrational. <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 11-12 (1992).

Applicable Ninth Circuit precedent forecloses Defendant Fleming's equal protection challenge, and indeed she "concedes the lack of current controlling case law in support of her argument[.]" Doc. No. 229 at 4. The Ninth Circuit squarely rejected a rational basis challenge to the classification of marijuana as a schedule I substance in <u>Miroyan v. McGinnis</u>, 577 F.2d 489, 495 (9th Cir. 1978). Although Fleming argues that since <u>Miroyan</u>, additional studies and changes in state law have called into question the rationality of Congress' policy, there remains sufficient debate regarding the public benefits and potential for harmful consequences of marijuana use to find a rational basis to uphold the continued classification of marijuana as a schedule I controlled substance. As the court observed in <u>Raich II</u>, "federal law is blind to the wisdom of a future day when the right to use medical marijuana to alleviate excruciating pain may be deemed fundamental." 500 F.3d at 866. And while "that day may be upon us sooner than expected," <u>id.</u>, Defendant Fleming has not carried her heavy burden to convince this Court to announce its arrival in this case. The motion to dismiss for violation of Defendant Fleming's Fifth Amendment right to equal protection is denied.

**D.      Discovery motions: Defendant Fleming's motion for revelation and production of confidential source who made controlled buys from Jason Washington, and examination of the source in an in camera hearing (Doc. No. 139); Defendant Sann's motion for an order directing the prosecutor to inspect investigative files for exculpatory information and**

**motion for an order directing the prosecutor to give notice of and make available for copying exculpatory or favorable information on or before July 27, 2012 (Doc. Nos. 157, 160)**

### 1.    Confidential source

The affidavit filed in support of the wiretap application in this case describes two controlled purchases of marijuana from Defendant Washington by a government informant referred to as "Confidential Source #2." The informant arranged for a third controlled purchase, but according to the affidavit the deal was aborted when Defendant Washington observed the vehicle of a HIDTA task force detective nearby. Defendant Fleming now moves for the revelation of the informant's identity and requests an opportunity to question the informant, or, in the alternative, for the Court to question the informant in camera. Defendant Fleming expects that the informant will testify to Fleming's lack of involvement in any criminal activity. The United States opposes the motion, states that it will reveal the informant's identity, along with any potential impeachment information, after the September 7, 2012, plea agreement deadline.

Under Roviaro v. United States, 353 U.S. 53, 59 (1957), the government has a limited privilege to refuse to disclose identity of an informant. The defendant has the burden to show need for disclosure. United States v. Williams, 898 F.2d 1400, 1402 (9th Cir. 1990). Disclosure is required only where it would be relevant

and helpful to the defense or essential to a fair determination of the cause. Roviaro, 353 U.S. at 60-61. In assessing a motion for disclosure of an informant's identity the court must balance the following considerations: "(1) the degree to which the informant was involved in the criminal activity; (2) how helpful the informant's testimony would be to the defendant; [and] (3) government's interest in non-disclosure." United States v. Gil, 58 F.3d 1414, 1421 (9th Cir. 1995). A district court is required to hold an in camera hearing upon a "minimal threshold showing" that the informant's information "may be relevant and helpful to a possible defense at trial," United States v. Spires, 3 F.3d 1234, 1238-39 (9th Cir. 1993), but mere speculation that disclosure will be helpful is not enough. United States v. Trejo-Zambrano, 582 F.2d 460, 466 (9th Cir. 1978).

Defendant Fleming's motion for revelation fails because her argument is purely speculative. She notes that the discovery shows the confidential source claimed to be a friend of Defendant Washington and that the informant never mentioned her. From there Defendant Fleming assumes that informant would testify that she did not enter a conspiracy, that she behaved professionally at all times, that she is a hard-working and non-violent person, and that she believed that her actions were legal. There is no basis to conclude the informant knows anything at all about Fleming or her mental state at the time of the charged

conduct.  Because Fleming has not shown the informant's information will be helpful, she has not met her burden under <u>Roviaro</u> and her motion will be denied.

However, the government shall reveal the informant's identity, along with any potential impeachment information, on or before September 14, 2012, which is one week following the September 7, 2012, plea agreement deadline.

## 2.    Exculpatory information

Under <u>Brady v. Maryland</u>, the prosecution must disclose to the defense any evidence in the government's possession that is favorable to the accused and material to either guilt or punishment.  373 U.S. 83, 87 (1963).  <u>Brady</u> places an affirmative duty on the prosecutor to seek out information in the government's possession that is favorable to the defendant.  <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995).  The government's failure to disclose favorable information to the defense will rise to the level of a constitutional violation under <u>Brady</u> only if the following three elements are satisfied:

(1)    the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;

(2)    that evidence must have been suppressed by the prosecution, either willingly or inadvertently; and

(3)    prejudice must have ensued.

<u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

The prejudice prong requires that the evidence suppressed be material. Kyles, 514 U.S. 419; United States v. Bagley, 473 U.S. 667 (1985). Evidence is material under Brady if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434. In deciding whether such a reasonable probability exists, a district court should consider the impact of the suppressed evidence collectively, rather than on an item-by-item basis. Id. at 436.

Defendant Sann's motions seek two categories of information. First, he wants all FBI or DEA reports or summaries of interviews of any individual who allegedly participated in the charged conspiracy. The second category consists of what Defendant Sann claims are 50 boxes of documents seized in an unrelated criminal investigation. Sann contends the evidence he seeks is exculpatory because the witnesses and documents likely confirm that he intended only to be involved in a lawful marijuana dispensary under state law, and that he withdrew from the venture on June 30, 2011.

Defendant Sann fails to meet Brady's materiality requirement because it is

ultimately irrelevant whether Sann intended to comply with the State of Montana's medical marijuana law; such information is not exculpatory. It is also not relevant whether Defendant Sann withdrew from the conspiracy as he claims on June 30, 2011, because many overt acts in furtherance are alleged occurred before that date. See United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir. 1992) ("[O]nce an overt act has taken place to accomplish the unlawful objective of the agreement, the crime of conspiracy is complete and the defendant is liable despite his later withdrawal."). Defendant Sann's argument is also speculative, as he concedes in his immunity brief that he "cannot candidly represent to this Court that Counsel is sure these witnesses will testify favorably" for Sann. Doc. No. 195 at 6.

As to the dispute regarding boxes of documents seized in an unrelated investigation, it is clear to the Court that the government has made the contents of those boxes available for review by defense counsel. Although Sann's counsel has complaints about the manner of access, the rules imposed by the FBI regarding access to the documents do not seem overly burdensome or unreasonable, and the government is in no better position than Defendant Sann to search the boxes for information.

Because Defendant Sann has failed to meet the standard for production under Brady and its progeny, the motions for production are denied.

**E. Defendant Sann's motion for immunity for defense witnesses or to dismiss if immunity if not granted, and motion in limine to exclude the testimony of immunized witnesses (Doc. Nos. 194, 263)**

Defendant Sann seeks immunity for those of his defense witnesses that he expects will invoke their Fifth Amendment right against self-incrimination and refuse to testify at trial. Sann argues it is unfair for the government to be permitted to present the testimony of immunized witnesses at trial while Sann is denied immunity for the witnesses he intends to call.

The United States has the authority to grant use immunity in order to secure a witness's testimony before a court or grand jury under 18 U.S.C. §§ 6002-6003. Prosecutors may also enter into informal immunity agreements for statements made in a witness interview. Plummer, 941 F.2d at 803. Witness immunity is generally not a two-way street in the criminal context. "The Fifth Amendment does not create a general right for a defendant to demand use immunity for a co-defendant, and the courts must be extremely hesitant to intrude on the Executive's discretion to decide whom to prosecute." United States v. Straub, 538 F.3d 1147, 1166 (9th Cir. 2008). Nonetheless, in narrow instances a defendant may compel use immunity upon a showing that: (1) the defense witness's testimony was relevant; and (2) either

(a) the prosecution intentionally caused the defense witness to invoke

the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process; or (b) the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness, with the effect of so distorting the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial.

Id. at 1162.

If a Fifth Amendment violation is found the remedy is not dismissal; the government must either grant immunity to the defense witness or proceed without its immunized witness. Straub, 583 F.3d at 1161.

Defendant's Sann's motion for immunity fails for the simple reason that he concedes he cannot satisfy the Straub test. Defendant Sann has not shown that he will call witnesses to testify contrary to the government's witnesses, as he admits he does not know what the prosecution's witnesses will say. In fact he has not established that the prosecution will call an immunized witness, making the motion premature under Straub. Defendant Sann also fails to show that the defense witnesses' testimony will be relevant. In fact, it appears the sole reason Sann hopes to call the witnesses is to establish that he did not agree to any activity outside of what was permissible under state law. That point is irrelevant to the question of guilt or innocence at trial in this federal criminal case. Even if the

Court were to find a Fifth Amendment violation here, the government's refusal to grant immunity to Sann's witnesses would not warrant dismissal, but instead would require the government to choose between granting immunity to Sann's witnesses or proceeding without its immunized witnesses.

Defendant Sann has failed to justify intrusion by this Court into the government's zone of discretion with regard to witness immunity under the standard set out in <u>Straub</u>. The motion for immunity for defense witnesses is denied, as are the related motions to dismiss and to exclude immunized testimony of government witnesses. These motions are subject to renewal at trial upon a showing that compelled immunity for defenses witnesses is warranted under <u>Straub</u>.

**F.    Motions in limine regarding evidence of Montana's medical marijuana law, compliance with that law, and the defense of mistake of law (Doc. Nos. 173, 177, 205, and 270)**

The United States has filed a motion in limine seeking to preclude the Defendants from introducing evidence of Montana's medical marijuana program for the purpose of establishing the defenses of medical necessity, mistake of law, advice of counsel, or estoppel. Defendant Fleming has filed a motion in limine seeking a pretrial ruling that she be allowed to present facts supporting a mistake of law defense at trial. Defendant Sann has filed a similar motion in limine

seeking an advance ruling of the admissibility of facts in support a defense that he withdrew from the conspiracy.

Permitting the government to prosecute the case without any mention of medical marijuana would create an artificial and confusing picture for the jury. Given the factual context in which these allegations arise, it is unreasonable to expect that the evidence can be presented at trial without the occasional reference to facts associated with the medical marijuana trade such as caregivers, cardholders, patients, storefronts, grow operations, business documents, etc. The Court will not impose an absolute prohibition on such references where they arise in the context of the evidence. However, as Defendants are charged with a federal crime, evidence concerning the Montana Medical Marijuana Act, any compliance with state law, or any beliefs about the legality of medical marijuana under state law is irrelevant under Fed. R. Evid. 403. If non-legal medical marijuana evidence about the offense conduct or investigation would be helpful to the jury, is relevant, does not violate Rule 403 or any other rule of evidence, and is admitted for some reason other than establishing a defense precluded by this order, it is admissible. Any questions regarding what evidence is permissible should be raised with the Court outside the presence of the jury.

Defendant Fleming's motion to allow facts supporting a mistake of law

defense is denied.  The conspiracy charge in Count I requires only that the Defendants knew they were conspiring to manufacture and distribute marijuana. 21 U.S.C. §§ 841(a)(1) and 846; <u>United States v. Rosenthal</u>, 334 Fed.Appx. 841, 842-43 (9th Cir. 2009).  The government need not prove knowledge of illegality or intent to violate the law.  <u>Bryan v. United States</u>, 524 U.S. 184, 192 (1998) ("[T]he term 'knowingly" does not necessarily have any reference to a culpable state of mind or to knowledge of the law.").

Defendant Sann's motion to allow evidence of his withdrawal from the conspiracy is also denied.  Defendant Sann has not established a prima face case of withdrawal as required by <u>Lothian</u>, 976 F.2d at 1261-62, because he does not dispute the many overt acts that allegedly occurred prior to June 30, 2011.

## G.  Defendant Sann's motion to sever (Doc. No. 161)

The public has a substantial interest in the joint trial of defendants jointly charged under Rule 8(b) of the Federal Rules of Criminal Procedure.  <u>United States v. Camacho</u>, 528 F.2d 464, 470 (9th Cir. 1976).  The public interest favors joint trials because they "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial."  On the other hand, Rule 14(a), Fed. R. Crim. P. states, "If the joinder of offenses or defendants in an indictment, an information, or a

consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants's trials, or provide any other relief that justice requires."

A trial judge has wide discretion in deciding a motion to sever, and such decisions will seldom be disturbed on appeal.  United States v. Ponce, 51 F.3d 820, 831 (9th Cir. 1995).  The Ninth Circuit has characterized the scope of review as "extremely narrow," see United States v. Mariscal, 939 F.2d 884, 886 (9th Cir. 1991), and quoted with approval a Second Circuit decision calling a district court's severance ruling "virtually unreviewable."  United States v. Baker, 10 F.3d 1374, 1387 (9th Cir. 1993) (quoting United States v. Stirling, 571 F.2d 708, 733 (2d Cir. 1978)).  It is not enough for a defendant to show that he would stand a better chance of acquittal in a separate trial.  Zafiro v. United States, 506 U.S. 534, 540 (1993).  Severance should be granted where joinder is "so manifestly prejudicial that it outweighs the dominant concern with judicial economy[.]"  United States v. Doe, 655 F.2d 920, 926 (9th Cir. 1980) (quoting United States v. Brashier, 548 F.2d 1315, 1323 (9th Cir. 1976)).  The Supreme Court has held severance should be limited to those instances in which "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

<u>Zafiro</u>, 506 U.S. at 539.

The Ninth Circuit has identified the following factors as among those to be considered in evaluating the prejudicial effect of joinder:

(1)     whether the jury may reasonably be expected to collate and appraise the individual evidence against each defendant;

(2)     the judge's diligence in instructing the jury on the limited purposes for which certain evidence may be used;

(3)     whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror; and

(4)     whether [the defendant can] show, with some particularity, a risk that the joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

<u>United States v. Fernandez</u>, 388 F.3d 1199, 1241 (9th Cir. 2004).  The first two factors bear particular emphasis in the severance inquiry.  <u>Id.</u>  "The judge's diligence in instructing the limited purposes for which various evidence may be used is a 'critical factor' in assessing the jury's ability to compartmentalize the evidence against each defendant."  <u>Baker</u>, 10 F.3d at 1387 (quoting <u>United States v. Cuozzo</u>, 962 F.2d 945, 949 (9th Cir. 1992)).  Careful and frequent cautionary instructions can reduce or eliminate any prejudice which might otherwise result from a joint trial.  <u>United States v. Castro</u>, 887 F.2d 988, 998 (9th Cir. 1989); <u>Fernandez</u>, 388 F.3d at 1243.

Upon careful consideration, the Court finds that severance of Defendant Sann's trial from that of his remaining co-defendants is warranted in this instance, but not for the reasons advanced by Defendant Sann at the time of the hearing on August 7. Instead, the Court finds that Defendant Sann has presented a significant amount of evidence tending to show that his involvement in the charged conspiracy was limited in time and in scope to what Sann believed was a lawful medical marijuana dispensary under Montana law. Nothing in the affidavits filed in support of the wiretap applications contradicts Sann's characterization of his involvement. And while it remains irrelevant whether the medical marijuana venture was in fact in compliance with state law, and it is no defense that Sann withdrew from the venture on June 30, 2011, it is undeniably harmful to Sann's interests for him to stand trial alongside his co-defendant Washington, against whom there is considerably more prejudicial evidence. The record at this stage indicates that the evidence against Defendant Washington may include, among other things, possession of firearms, high-volume black market drug transactions, and discussions about how best to bribe public officials to protect the venture, nearly all of which occurred after Defendant Sann claims to have sold his interest in the venture.

The Court could of course instruct the jury not to consider such evidence

against Defendant Sann, but such instructions would not, in the Court's view, be sufficient to entirely cure the taint in this instance. Defendant Sann has presented facts sufficient to support his defense theory that he is a businessman who agreed to become a passive investor in an open and obvious medical marijuana business venture, not a criminal drug dealer. It is far from clear whether that defense will succeed at trial in light of the rulings herein, but Defendant Sann is entitled to make the attempt. In presenting evidence in support of his defense, Defendant Sann will be constrained by the rulings of the Court, and will be walking a carefully scrutinized evidentiary tightrope in this effort. Nevertheless, Defendant Sann's right to a fair trial will be dramatically compromised if he is forced to present his case while overcoming the evidence of much more serious criminal conduct against Defendant Washington. The Supreme Court observed in <u>Zafiro</u> that severance is appropriate

> when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.

506 U.S. at 539.

Defendant Sann faces such a risk is in this case, and for that reason his motion to sever is granted.[7]  Defendant Sann will proceed to trial as scheduled on October 1, 2012.  The trial of Defendants Washington and Fleming will be vacated and reset for a later date.

**H.     Motions in limine (Doc. Nos. 245, 247, 249, 251, 253, 256, 259, 261, 265, and 340)**

Defendant Sann has filed several motions in limine.  The motions seek nothing more than a generalized restatement of already applicable rules of evidence in a number of areas.  In the absence of a request to exclude specific evidence or testimony, the motions are denied, subject to renewal at trial, when the request can be evaluated in the context of the proof at trial.

Defendant Fleming has filed a motion in limine seeking to exclude the government's evidence against her derived from electronic surveillance based on Fleming's argument that the activity captured on the wiretap does not relate to the charged conspiracy.  She requests that the evidence be excluded under Fed. R. Evid. 404(b).  Whether Defendant Fleming's conduct relates to the charged conspiracy is a question that cannot be answered until the Court has an opportunity to hear the proof at trial.  If Fleming is correct and the government's

---

[7]In light of this ruling, Defendant Sann's motion in limine to exclude evidence of uncharged conduct (Doc. No. 175) is denied as moot.

evidence against her shows innocent conduct unrelated to the charges, the proper basis for exclusion is not Rule 404(b), but rather Rules 401 and 402. The government is aware of its obligations under Rule 404(b)(2), <u>see</u> Doc. No. 208, and the Court will enforce the Rules of Evidence at trial. Defendant Fleming's motion is denied, subject to renewal at trial.

## IV.  Conclusion

These rulings are consistent with those of other courts who have considered and struggled with these same issues. The Court fully understands that this consistency will be of little solace to the Defendants in this case and will not obviate the unfairness they feel regarding the current posture of the law. However, marijuana remains illegal under federal law. The arguments advanced by the Defendants are currently foreclosed by precedent of the Supreme Court and the Ninth Circuit Court of Appeals which binds this Court and constrains its discretion.

## V.  Order

Based on the foregoing, IT IS HEREBY ORDERED

1.    Defendant Fleming's motion for revelation and production of confidential source (Doc. No. 139) is DENIED. The government shall reveal the informant's identity, along with any potential impeachment information, on

or before September 14, 2012.

2.      Defendant Fleming's motion to dismiss the Indictment as barred by the

Tenth Amendment (Doc. No. 150) is DENIED.

3.      Defendant Fleming's motion to dismiss the Indictment for violation of her

Fifth Amendment rights (Doc. No. 152) is DENIED.

4.      Defendant Fleming's motion to suppress (Doc. No. 153) is DENIED.

5.      Defendant Sann's motion to dismiss the Indictment based on promissory

estoppel (Doc. No. 154) is DENIED.

6.      Defendant Sann's motion to dismiss the Indictment based on judicial

estoppel (Doc. No. 155) is DENIED.

7.      Defendant Sann's motion to dismiss the Indictment based on estoppel by

official misleading (Doc. No. 156) is DENIED.  Defendants will have the

opportunity at trial to present evidence in support of a defense of estoppel

by official misleading only as it relates to their interactions with Officer

Arlen Auld.

8.      Defendant Sann's motion to order the government to inspect its files for

Brady information (Doc. No. 157) is DENIED.

9.      Defendant Sann's motion to order the government to give notice of and

make available for copying Brady information (Doc. No. 160) is DENIED.

10. Defendant Sann's motion to sever (Doc. No. 161) is GRANTED. Defendant Sann will proceed to trial as scheduled on October 1, 2012.

11. Defendant Sann's motion in limine to allow offer of evidence of compliance with state law to support defense of withdrawal from conspiracy (Doc. No. 173) is DENIED.

12. Defendant Sann's motion in limine to exclude evidence of uncharged conduct (Doc. No. 175) is DENIED.

13. Defendant Sann's motion in limine to allow evidence of compliance with state law as support of defense of scope of culpability (Doc. No. 177) is DENIED.

14. Defendant Washington's motion to suppress (Doc. No. 180) is DENIED.

15. Defendant Washington's motion to dismiss based on entrapment by estoppel or estoppel by official misleading statement (Doc. No. 182) is DENIED. Defendants will have the opportunity at trial to present evidence in support of a defense of estoppel by official misleading only as it relates to their interactions with Officer Arlen Auld.

16. Defendant Sann's motion for immunity for defense witnesses, or to dismiss if immunity is not granted (Doc. No. 194) is DENIED, subject to renewal at trial.

17.    The government's motion in limine regarding medical marijuana issues (Doc. No. 205) is GRANTED in part and DENIED in part as set forth herein.

18.    Defendant Sann's motions in limine (Doc. Nos. 245, 247, 249, 251, 253, 256, 259, 261, 263, and 265) are DENIED, subject to renewal at trial.

19.    Defendant Fleming's motion to allow evidence in support of a mistake of law defense (Doc. No. 270) is DENIED.

20.    Defendant Fleming's motion to exclude Rule 404(b) evidence (Doc. No. 340) is DENIED, subject to renewal at trial.

IT IS FURTHER ORDERED that the trial setting for Defendants Washington and Fleming is VACATED, to be reset by subsequent order.  All other dates in the pretrial schedule remain in effect as to those Defendants.

IT IS FURTHER ORDERED that Defendant Sann's motion to seal the proffers of testimony for the defense witnesses who asserted their Fifth Amendment right not to testify at the hearing (Doc. No. 335) is DENIED.

Dated this 22nd day of August, 2012.

Dana L. Christensen, District Judge
United States District Court